**HICKS v. FONTAINE FERRY ENTER-PRISES, Inc.**

**BRADEN v. FONTAINE FERRY ENTER-PRISES, Inc.**

Court of Appeals of Kentucky.
Feb. 8, 1952.

As Modified on Denial of Rehearing
April 25, 1952.

W. S. Heidenberg, Raymond F. Bossmeyer and Alex Berman, all of Louisville, for appellants.

Woodward, Hobson & Fulton and L. R. Curtis, all of Louisville, for appellee.

CAMMACK, Chief Justice.

The appellants, Edward Hicks and Ruby Braden, were injured while riding in a Loop-O-Plane at an amusement park operated by Fontaine Ferry Enterprises, Incorporated. They filed separate actions for damages, but the cases were consolidated for trial. At the conclusion of all the evidence a verdict was directed in favor of the appellee. Reversal is urged on the ground that there was sufficient evidence to warrant the submission of the case to the jury.

The appellants contend that the doctrine of res ipsa loquitur applies, since the Loop-O-Plane was under the exclusive control of the appellee. This doctrine involves a rule of evidence which, when applicable for the plaintiff, requires that the burden of going forward with the evidence be shifted to the defendant in order that he have an opportunity to explain away the cause of the injury. Fannin v. Lewis, Ky., 243 S.W.2d 60.

Under the circumstances, a description of the mechanism of the Loop-O-Plane is necessary. The Plane consists of a vertical center tower which is constructed of metal and is hollow. A horizontal tower of similar construction is mounted on top of the vertical tower and welded to it. The

horizontal tower extends a distance of 14 feet on each side of the vertical tower. A large sprocket wheel is attached to each end of the horizontal tower and a metal shaft extends through each sprocket wheel. Metal rods are attached to the sprockets by means of bolts. The rods (referred to as vertical rods) are hollow and 14 feet in length. The carriages, or seats, one on each side of the vertical tower, are attached to the ends of the vertical rods. The operator's control box is to the left of the Plane. From this box the operator controls the motor and the brake. Electrical wires run from the control box through an underground conduit up through the vertical tower to the motor and the lights. The motor is attached at the top of the vertical tower by means of metal brackets. A mechanical brake is located below the motor and it is controlled by the operator by means of a wire extending from the control box to the brake. The differential is located approximately two feet below the motor. A small sprocket wheel is attached to each end of the differential. A large sprocket chain, which is self-lubricating, encircles the small wheel and also the large one which is attached to the horizontal tower. The motor furnishes power to the differential, which in turn causes the large sprocket wheel to rotate, thereby causing the carriages to move in a circle. The carriages, moving like an ordinary swing, make a complete revolution after attaining a height of some 18 feet. They are constructed of metal and are six feet long and 36 inches wide. Wire screens cover the top of the carriages as safety devices. Each carriage has two seats which are back to back and each seat accommodates two persons. The seats are made of wood and are covered with cotton padding one-half inch thick. The padding is covered with a leatherette material. There is a wooden footrest in the bottom of each carriage. There are no electrical wires or heating devices attached to or connected with the carriages.

The appellants purchased tickets to ride on the Plane about 8:00 p. m. They entered the carriage next to the control box and occupied the same seat. They said that about 30 seconds after the carriage began to move the seat started getting hot. Both yelled to the operator to stop the Plane, but he did not hear them. Both parties said they saw smoke coming from the motor just as the carriage reached the top of its swing. Immediately thereafter flames broke out on the seat directly beneath Hicks. They yelled again to the operator and he stopped the Plane. Hicks' burning clothes were torn from his body. He was burned seriously and Ruby Braden also sustained painful injuries.

It follows from what has been said that the doctrine of res ipsa loquitur does not apply in this case. No electrical or mechanical defects were shown. Neither the exterior nor the interior wooden part of the carriage was burned; only the leatherette covering and cotton padding on the side where Hicks was sitting were burned. After the appellants entered it the agents of the appellee were in no position to observe or control the actions of the occupants. It is true that the operator controlled the movement of the Plane, but there is nothing about its movement which would cause a fire. There was no breakdown or any defect shown in any of the mechanism. In fact, there was nothing about the carriage which would cause it to catch fire. It is quite true that the accident was a very unusual one, but there is nothing to show that it would not occur if the appellee's agents were exercising care. It is our view that the appellants and the appellee were placed on equal footing, insofar as the burden of ascertaining the cause of the fire is concerned.

In Chadwick v. Louisville & N. R. Co., 213 Ky. 831, 281 S.W. 1018, 45 A.L.R. 1537, a passenger, who was injured when a window fell on her arm, sought to apply the doctrine of res ipsa loquitur on the ground that the window was under the exclusive control of the Railway Company. It was held that the doctrine did not apply because the window was not under the exclusive control of the Railway Company, since passengers were frequently opening and closing the windows.

It follows that, if the appellants were entitled to have their case submitted to

the jury, it was incumbent upon them to show that the appellee was negligent and that this negligence was the proximate cause of their injuries. Ruby Braden said she rode on the Plane around 6:00 p. m. While she and some friends were waiting to ride, they heard a mechanic ask an operator of the Plane if it was operating properly. The operator replied, "It is working all right, but there is hot oil leaking from it." The mechanic said that this was not serious and to go ahead and operate the Plane. Ruby Braden said also that, after the fire which burned her and Hicks, there was oil on her slacks and shoes. Hicks' trousers were offered in evidence and there was an oil spot near his back pocket. Both Hicks and Ruby Braden testified that their clothes were free from oil stains when they entered the carriage. It is their position that, since there was oil on their clothes when they left the carriage after the fire, there must have been oil on the seat. Both parties said they saw smoke coming from the motor just before the fire started. They described the smoke as about as much as one would see when a person is smoking a cigarette. But, even if it be assumed that the agents of the appellee were negligent in failing to discover a defect in the motor, it was still incumbent upon the appellants to show some causal connection between the defective or smoking motor and the fire in the carriage.

A contention of the appellants is that, since smoke was coming from the motor, it is reasonable to infer that it was on fire, and also that it is reasonable to presume that the fire was of such intensity as to cause the oil in the motor to ignite. The hot oil then flowed through the horizontal tower (a distance of 14 feet) and dropped a distance of 14 feet and ignited the oil inside the carriage. We have noted that the horizontal tower was welded to the vertical tower. It would be virtually impossible for hot oil to follow this course, in the absence of a mechanical defect in the towers, which was not shown.

The next contention is that there was oil in the differential and that the fire in the motor could have caused this oil to ignite.

Upon this theory the hot or burning oil from the differential would have traveled about the same distance as through the towers. Here, too, it would have been necessary for the hot oil to get into and escape from the enclosed differential which was not shown to be defective. Two experts testified that the fire could have started in either of the manners just described.

Conceivably, burning oil could have traveled a distance of more than 14 feet from the motor to the carriage seat, but there is no proof showing that it did travel such a course. No oil was seen dripping from any part of the mechanism about the Plane. The statement of the operator as to oil dripping on the hood could have referred to any one of four hoods. The proof showed that there was smoke about the motor, but no one said they saw fire about it or at any place other than the seat under Hicks.

We think the appellants failed to show that the appellee's negligence was the proximate cause of the injury. To warrant the submission of a case to the jury there must be some evidence of probative value showing that the negligence of the defendant was the proximate cause of the plaintiff's injuries. A jury can not be left to speculate as to how an accident occurred. Stacey v. Stoner, 260 Ky. 848, 86 S.W.2d 1006. It has been pointed out frequently that a jury may deduce reasonable inferences from the evidence, but a decision may not be rested upon unreal or remote inferences. Likewise, inferences may not be pyramided. Elcomb Coal Co. v. Gray's Adm'x, 273 Ky. 230, 115 S.W.2d 1056.

The facts in the case of Bee's Old Reliable Shows v. Maupin's Adm'x, 311 Ky. 837, 226 S.W.2d 23, are clearly distinguishable. In that case there was proof showing that the device in which the injured party was riding was operated at an excessive speed and was stopped suddenly. It was pointed out also that the uncontradicted physical facts supported the plaintiff's theory of the case.

Judgment affirmed.